LYON COUNTY NATIONAL BANK, Appellee, v. JOHN CREGLOW et al., Appellants.

**FRAUDULENT CONVEYANCES:** Evidence—Sufficiency. Evidence held insufficient to show that certain conveyances were without consideration and with intent to defraud creditors.

Headnote 1: 27 C. J. p. 828.

*Appeal from Lyon District Court.*—WILLIAM HUTCHINSON, Judge.

MAY 12, 1925.

SUIT in equity in the nature of a creditor's bill, to have adjudged fraudulent certain transfers of real estate, and to impress a judgment obtained by plaintiff against defendant John Creglow, as a lien on property held by defendant Bertha Creglow, wife of John Creglow, claimed to be held in secret trust for John Creglow. Decree was entered in favor of plaintiff, from which defendants appeal.—*Reversed.*

*Harvey H. Hindt,* for appellants.

*Fisher & Riter,* for appellee.

ARTHUR, J.—The questions involved are largely of fact. There can be no serious controversy as to the law applicable to the material facts, once they are determined.

John Creglow and James Creglow, about the year 1876, located in the vicinity of Rock Rapids, in Lyon County, Iowa,

and operated together in farming and dealing in land in Iowa, Minnesota, and South Dakota, up to and including the year 1914, when they dissolved their partnership. They first rented land ·for farming, and, a few years later, James purchased a 220-acre tract of land adjacent to the town of Rock Rapids. A little ·later, John purchased 80 acres adjoining the land · of James, in the same section; and the two brothers also purchased in partnership another 80 in the same section, the title to which was taken in the name of John. During the time they were in partnership, they bought land in Minnesota, and afterwards traded it for some land in Lyon County, and in 1910, sold said Lyon County land, and used the money in buying Canadian land. Another brother, Charles Creglow, was interested with John and James in Canada land. The purchases of Canada land in which Charles was interested were sold, and afterwards John and James purchased and owned together 1,920 acres of land in Canada, located near Medicine Hat, in the province of Alberta. In the year 1913, John and James sold their Canada land at $25 an acre, on contracts. On June 27, 1914, James Creglow owned the farm of 220 ·acres near Rock Rapids, and some other ·land, and a one-half interest in the contracts of sale of the Canada land. John owned the west half of ·the southeast quarter of Section 6, a one-half interest in the east half of the southeast quarter of said section, and a one-half interest in the Canadian land contracts.

In the spring of 1914, John and James decided to dissolve · their partnership and divide the partnership property. On June 27, 1914, John deeded to James all of his land holdings in Lyon County, his wife, Bertha, joining in the deed, the land conveyed being the southeast quarter of Section 6; and, at or about the same date, James transferred to John his one-half interest in the Canadian land contracts, thus making division of the partnership property. On this same date, James quit-claimed to Bertha Creglow, wife of John Creglow, the 220-acre farm owned by him. In February, 1919, the 220-acre farm was conveyed by Bertha Creglow, her husband joining in the deed, to E O. Carpenter and W. D. Carpenter, the Carpenters, as part of the purchase price, executing to Bertha Creglow mort- ⁄ gages on said land, in the amount of $45,000. This action was

brought to subject said mortgages to the payment of a judgment obtained in the Lyon district court, on September 14, 1922, against John Creglow, in the amount of $4,049.22.

It is the claim of appellee that, while the conveyance by John of his Lyon County land to James was for the apparent and claimed purpose of dividing the partnership property, in truth and in fact such conveyance was without consideration, and made with the design and purpose of cheating and defrauding the creditors of said John Creglow, and particularly, to prevent appellee from collecting its judgment against John Creglow; and that the 220-acre farm conveyed by James to Bertha was paid for by John, in whole or in part; and that the transfer was made to defraud appellee. It is the further claim of appellee that the Canada land contracts were of little or no value, and that, in reality, the exchange of the Lyon County properties was a scheme designed and carried out to, in an indirect way, place the title of the property of John in his wife, Bertha, to hold same in secret trust for John.

It is the claim of appellants, in their pleadings and testimony, that the settlement of the partnership between John and James was a transaction entirely separate, and that it had no relation to or connection with the conveyance of the 220-acre farm to Bertha; that the consideration which John received for the transfer of the 80 in Lyon County which he had owned, and the interest in the other 80 in which he had a half interest with James (which was the equivalent of John's owning 120 acres), was the transfer by James to John of his interest in the Canada land contracts. It is the contention of appellants that James's interest in the Canada land was of about the same value as 120 acres of land in Lyon County.

The only testimony as to the value of the Canadian land interests is that, in 1914, it was worth $37,000 to $38,000, and that James's interest therein, which he transferred to John, was of the approximate value, in 1914, of $18,000. On the value of the Lyon County land, the testimony is that the 80 acres which John owned individually, and the 80 acres in which he owned a one-half interest, making the equivalent of 120 acres owned by John, were worth $150 an acre, or were of the value of about $18,000. The claim of appellants as to the 220-acre farm, of

which James had been exclusive owner since 1889, is that the transfer was for a valuable consideration, and had no connection whatever with the .other transfers. The consideration claimed is that James had made his home with Bertha and John for about 30 years, without compensating them in any way. James had never married, and was 68 years of age, with no direct heirs. The testimony is that James had stated many times that he intended to convey the land to Bertha, and had promised her that he would. He had made his home with Bertha, and she had done his washing, mended his clothes, and boarded him, without compensation. The immediate reason assigned and shown in evidence which prompted the transfer at the time it was made, was to enable Bertha to give a bond for her son, who was in trouble, and required bond at that time.

Outside of the testimony of appellants and James Creglow, the only evidence concerning the transfers was the two deeds. Both deeds were made on June 27, 1914, and filed for record on June 29th. The deeds were acknowledged before the same notary, and each recited, "one dollar and other good and valuable consideration." It is upon the supposition that one deed was given in exchange for the other, that appellee bases its case. There is no mention in either deed that it was to be an exchange for the other. We have carefully examined all the evidence, and find no support for the position of appellee that the several transfers of property were made for the purpose of preventing appellee from collecting its judgment against John, except the inference, if any, that might be drawn from the coincidence of transfer. On the contrary, we think the evidence fairly supports the claim of appellants that said transfers were made in good faith, without intention to evade payment of the judgment. We think that the claim of appellee and the finding of the court to the effect that the transfer by John to James of the Lyon County land in exchange for the Canadian land contracts was without valuable consideration because the Canadian land contracts were of doubtful and little value at the time, 1914, are without support in the evidence; and that the contention of appellee that, after the transfer of his land on June 27, 1914, John was insolvent, is without support in the evidence. The transfer by John on June 27th did result in leaving John without

real estate in Iowa, but he was not then insolvent. He had property which he held in the state of Iowa. He held the Canadian land contracts, which the uncontradicted testimony shows were worth $37,000 to $38,000. He had these contracts with him where he lived in Lyon County. At one time, some of the contracts were held by the appellee bank as collateral for the debts of John and Charles. These contracts were personal property located in Iowa, and were available for payment of John's debts, along with other assets which John possessed, after June 27, 1914. The evidence shows that he had $2,000 worth of stock and farm machinery which he sold to his sons, for which they afterwards paid him $2,000. It appears in evidence, and it is of common knowledge, that, after the World War started, and Canada got into the war, there occurred a large depreciation in the value of Canada lands, and consequent reduction in the value of land contracts, such as held by John. But the war did not start until after June, 1914. Taking into consideration the contracts for $37,000 or $38,000, the $2,000 worth of stock and machinery, and deposits of considerable amounts in the First National Bank of Rock Rapids, John had, after June 27, 1914, ample, sufficient, and available property in the state of Iowa to pay his indebtedness.

To support its claim that the transfer by John of his 120 acres to James was to effect, in an indirect way, conveyance of the 220-acre farm by James to John, by deeding it to Bertha to be held in secret trust for John, appellee alleged that John paid James, in whole or in part, for the 220-acre tract. Appellee produced no evidence to support this contention. On the other hand, Bertha testified that her husband had no interest in the 220-acre farm. John testified that he made no payment of any kind to James for said transfer to his wife. James testified that he received nothing from John for said transfer. If conveyance of the 220-acre farm by James to Bertha had no connection with the transfer of the 120 to James by John, as contended by appellants, then it matters not what, if any, consideration there was for the transfer of the 220-acre farm to Bertha. James did not owe appellee anything, and he could give the farm outright to Bertha, if he wanted to do so.

The note on which appellee's judgment was obtained, was

for $3,638.60, executed by John Creglow, May 4, 1921. This final note was the result of many renewals or new notes. John Creglow testified, and there was no testimony to the contrary, that the original loan, made on March 31, 1910, for $3,375, was made for Charles Creglow, and that he, John Creglow, signed the note with Charles Creglow, as surety; that he never received any money obtained by the note, and never received any money obtained at times of renewal or making new notes thereafter. On June 27, 1914, the date of the transfer of property in controversy, appellee held a note executed March 7, 1914, for $2,916.60, signed by Charles Creglow alone, and a note of the same date for $1,360.90, signed by Charles Creglow and John Creglow. The $1,360 note was the only note signed by John which the bank held on June 27, 1914; and John testified that said note represented all that he owed the bank at that time, and constituted his entire indebtedness. Afterwards, John signed several renewal notes, culminating in the note of May 14, 1921, on which the judgment was rendered. On March 3, 1919, John paid $2,000 on one of the subsequent notes, which $2,000 was money paid him by his sons for stock and machinery. Appellee contends that, while the only note they held, signed by John, in June, 1914, was for $1,360.90, said note, together with the other note for $2,916.60, signed by Charles, represented the indebtedness and obligation of John, as well as Charles. This is a matter in dispute. But whether or not John was indebted to the bank in only the amount of the one note for $1,360.90, as claimed by John, or for the amount of both notes, the evidence shows that John Creglow was solvent with respect to said indebtedness on June 27, 1914. O. P. Miller, president of appellee bank since 1904, seems to have considered John Creglow solvent as late as 1919. Miller testified:

"In 1919, at the time I had a talk with John, when he gave a renewal note and paid $2,000, I most certainly did consider John solvent, and I believe everybody in the northwest did."

The transfers of lands attacked were immediately recorded. Appellee waited more than eight years after said transfers were placed of record, before instituting this suit. It took appellee a long time to scent the fraud which it now claims was perpetrated. Whether or not appellee was guilty of laches, we do

not need to consider, in view of our conclusion that the evidence fails to prove actual fraud in the assailed transfers, and fails to disclose facts from which any reasonable inference can be drawn that fraud was perpetrated upon appellee.

Some other defensive matters need not be considered.

On careful examination and consideration of the whole record, we reach the conclusion that appellee has not made out a case entitling it to relief. The decree entered in the court below must be, and is, reversed.—*Reversed*.

ᐸ FAVILLE, C. J., and EVANS and ALBERT, JJ., concur.